

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

GERALD C. MANN
ATTORNEY GENERAL

February 18, 1939

Mr. Ralph Logan
County Attorney, Tom Green County
San Angelo, Texas

Dear Mr. Logan:

Opinion No. O-215
Re: Liability of a County
for taxes on its school
lands

This is in answer to your letter of January 24, 1939, to this office, which reads, in part, as follows:

"During the latter part of 1937 and the early portion of 1938, this County foreclosed its vendor's lien on approximately one thousand acres of School Land granted to this County by the State. All of this land is situated in Tom Green County. The State, County and School District taxes are delinquent on this land for the years 1932 through 1938; and the county is now preparing to place this land on the market for sale. The question has arisen as to the County's liability for these delinquent taxes; and, if the County is liable, from which fund the County is to pay these taxes.

"Since October 1, 1935, Tom Green County has received about $24,000.00 as interest money and lease money from its School lands, all of which has been deposited to the credit of the Available School Fund. This fund, of course, is under the supervision and control of the County School Superintendent. Only a small portion of this $24,000.00 revenue, which the County has received from all its school land since 1935, was obtained from the particular thousand acres upon which the taxes are now in question. Upon these

facts the Commissioners' Court is interested in the following questions:

"1. Is Tom Green County liable for the County and School District taxes levied on this County School Land for the years 1932 through 1938?

"2. If the County is liable for the County taxes for the years 1932 through 1938, can the Commissioners' Court legally remit County taxes?

"3. If the County is liable for the School District taxes, is there any legal method by which these taxes can be remitted?

"4. If the County and School District taxes cannot be remitted, can the County go into the Available School Fund under Article 7150a and pay these taxes from such fund on the theory that it is revenue derived from County School Land, regardless of whether the revenue was from this particular land upon which the taxes are levied or not?

"5. If the County cannot touch the Available School Fund to pay the County and School District taxes, can such taxes properly be paid from the General Fund of the County?"

As stated in 40 Tex. Jur. 100, "prior to the adoption of Const. Art. 7, Sec. 6a, lands granted to counties for educational purposes were exempt from taxation by force of Const., Art. 11, Sec. 9, and Art. 7, Sec. 6 . . ." Daugherty v. Thompson, 71 Tex. 192, 9 S. W. 99; Davis v. Burnett, 77 Tex. 3, 13 S. W. 613; and Montgomery v. Peach River Lumber Company, 54 Tex. Civ. App. 143, 117 S. W. 1061.

Article 11, Section 9, of the Constitution of Texas, which is still in effect, provides, in part, as follows:

"The property of counties, cities and towns, owned and held only for public purposes / . . and all other property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation."

Article 7, Section 6, which is also still in effect, provides, in part, as follows:

"All lands heretofore, or hereafter granted to
the several counties of this state for educational
purposes, are of right the property of said counties
respectively, to which they were granted, and title
thereto is vested in said counties . . . Said lands,
and the proceeds thereof, when sold, shall be held by
said counties alone as a trust for the benefit of
public schools therein."

The law prior to the adoption of Article 7, Section
6a, was expressed in Daugherty v. Thompson, supra, as follows:

"In view of the provisions made by the Con-
stitution of this state for the establishment and
maintenance of public free schools, no one would
contend that lands held by counties for that pur-
pose were not held solely for a public purpose.
Lands so set apart, and solemnly appropriated for
a purpose so essentially public as is the mainte-
annce of public free schools, must be said to be
'property devoted exclusively to the use and benefit
of the public.' Such property the Constitution ex-
empts from taxation."

But in 1926 a change was made with reference to taxa-
tion of certain school land by virtue of the adoption of Article
7, Section 6a, of the Constitution, in the form of an amendment,
as follows:

"All agriculture or grazing school land men-
tioned in section 6 of this article owned by any
county shall be subject to taxation except for State
purposes to the same extent as lands privately own-
ed. (Sec. 6a, Art. 7, adopted election November 2,
1926; proclamation January 20, 1927.)

It will be noticed that Art. 7, Sec. 6a, says that
"agriculture or grazing school land" shall be taxed, and this
brings up the question of whether or not there is some other
kind of school land that cannot be taxed. This question is
clarified by Article 5310 of the Revised Civil Statutes of
Texas, which provides, in part, as follows:

"The Commissioner (of the General Land Office)
shall from time to time, as the public interest may
require, classify or reclassify, value or revalue,

Mr. Ralph Logan, February 18, 1939, Page 4

any of the lands included in this chapter, desig-
nating the same as agricultural, grazing, or timber
or a combination of said classifications, according
to the facts in the particular case, and when entry
of the classification and the appraisement is made
on the records of the Land Office, no further action
on the part of the Commissioner, nor notice to the
County Clerk shall be required to give effect there-
to". (Parenthesis ours)

With reference to which class of school lands is tax-
able and which class is not by virtue of Art. 7, Sec. 6a of the
Constitution, and Art. 5310, R. C. S. the case of Childress
County v. Morton Independent School District, 95 S. W. (2)
1031, says:

"Under section 6a, supra, of the Constitution,
school lands belonging to any county are not taxable
unless such lands are agricultural or grazing lands.
Manifestly, therefore, if a county's school lands
were classified as timbered lands, they would not be
subject to taxation."

We feel that the rule in the case just quoted is a
correct expression of the law.

Therefore, if the school land you ask about is classi-
fied as timber land, our answer to your first question is that Tom
Green County is not liable for the County and School District
taxes levied on this land for the years you mention.

But, what is the answer if this land is classified as
agricultural or grazing land? You do not give its classification.
However, you do say that it is located in Tom Green County; and
with that suggestion as to the geographical location of the
land, we think we ought to be able to make a conclusion as to
its classification in the same manner that courts take judicial
notice of certain things. Chief Justice Cureton took judicial
notice of the "general physiographic features" of a county,
I. G.N. R. Co. v. Reagan, 121 Tex. 233, 49 S. W. (2) 414; Justice
Sharp said it is proper to take judicial notice of the location
of mountains and the courses of rivers, State v. Bradford, 121
Tex. 515, 50 S. W. (2) 1065; Justice Middlebrook took judicial
notice that the scenery is beautiful on the route from Port
Arthur to Galveston, T. & P. S. Ry. Co. v. Schevoight, 181 S. W.
802; Justice Quinn took judicial notice that the Gulf Coast
region of Texas is "flat, low and marshy", Jefferson County
Drainage Dist. No. 6 v. McFaddin, 291 S. W. 322; Chief Justice

Fly took judicial notice that Webb County is "in a dry or semi-arid portion of the state", Rosetti v. Camillo, 199 S. W. 526; Chief Justice Huff took judicial notice that Russian thistles grow throughout Texas and are a great nuisance, Vance v. Southern Kansas Ry. of Texas, 152 S. W. 743; and Justice Higgins took judicial notice that "prairie dogs are great pests upon the cattle ranches of Western Texas", Slaughter Cattle Co. vs. Pastana, 217 S. W. 749. Fortified with the knowledge that these judges took judicial notice of the things enumerated above, we think we are entitled to say that it is common knowledge that Tom Green County's forests consist almost exclusively of a few scattered mesquite trees, interspersed with some pecan trees and possibly some other varieties occasionally, and that Tom Green County's fame as a prosperous community of first class citizens has spread far and wide for many reasons, but not because of its lumber business. Everybody knows that Tom Green County would have a hard time supporting a saw mill, but that it ranks with the very best when it comes to raising sheep and goats as well as cattle in its great wide open spaces. The real truth of the situation is that none of its lands, school or otherwise, have been classified as timbered lands. They are all agricultural and grazing lands, and everybody knows that fact. Therefore, we will not fail to answer your question because of your failure to give the classification of the land.

We will now answer your questions on the basis that the land in question is classified as agricultural or grazing land.

Article 7, Section 6a, which is now the law, provides that "all agriculture or grazing land . . . owned by any county shall be subject to taxation" except for certain kind of taxes. As for the kind of taxes for which the county is liable, it is axiomatic that the county is not individually or personally liable for those taxes that accrued prior to the date that it regained ownership of the land. By virtue of Article 7151, R. C.S. the liability for taxes for the year is fixed on the person who owns the land on January 1st. This rule was stated in the case of Winters v. Independent School District of Evant, 208 S. W. 574, as follows:

"The ownership of property on the 1st day of January of any year creates a liability on the part of the owner for taxes levied upon such property for that year."

You do not give the date on which the county regained title to the land, but you do say that "during the latter part of 1937

and the early portion of 1938, this county foreclosed its
vendor's lien", and we assume that it obtained title and there-
by became owner at that time.

As for that kind of taxes for which the county is
liable, but which accrued prior to the time the county became
owner of the land, that is before the County foreclosed its
vendor's lien and thereby re-acquired the property, we believe
that the County is not individually or personally liable, but
the land is still subject to those taxes, and the County ac-
quired the land subject to them. This is the rule according
to the case of Childress County v. State, 127 Tex. 343, 92 S. W.
(2) 1011, which involved the liability of a County for taxes
on its agriculture school land; and in that case the court said:

"It is undisputed from the facts certified that
Enochs owned the land in controversy on January 1st of
the years 1931, 1932 and 1933. Enoch's ownership there-
of on Janury 1, 1933, created a liability on his part
for the taxes levied upon such property for that year . . .

"When the land reverted to Childress County, it
was reacquired subject to the taxes due thereon while
it was privately owned. Therefore, Childress County
can protect its interest in the land by paying the
taxes due Cochran County for the years 1931 and 1932,
or let it be sold for such taxes."

Under the terms of Article 7, Section 6a, quoted above,
"all agricultural or grazing school land . . . owned by any
county. . . shall be subject to taxation, except for State pur-
poses." The phrase "except for State purposes" only means what
it says, that is that this land is not subject to State taxes.
It is clearly subject to County and School District taxes.

Article 7, Section 6a, says further that the land
"shall be subject to taxation . . . to the same extent as lands
privately owned." We believe that this last phrase means in
the same manner and at the same rate that privately owned land
is taxed.

Our answer to your first question, on the basis that
this is agricultural or grazing school land, is that for those
years during which Tom Green County was owner of the land (as
of January 1st of the year), which was after it had foreclosed
its vendor's lien, the County is individually liable for the
County and School District taxes (we do not know whether that

title passed before or after January 1, 1938); and for those prior years during which the purchaser was owner and the County only had a lien the County is not individually liable for the County and School District taxes but the land is subject to these taxes, and the County may pay these taxes to protect the land from foreclosure for them if it so desires.

We will now discuss your next two questions, numbers two and three, together.

As said in 11 Tex. Jur. 565, "The county Commissioners' Court is the active governing body of the county, with a jurisdiction that touches in some respect almost every feature of the county's business, and the court has full and general charge of the business affairs of the county". But this rule is limited by the rule stated in the case of Landman v. State, 97 S. W. (2) 264, as follows:

"Commissioners' Courts can exercise only such powers as the Constitution or the Legislature specifically confer upon them, Constitution, Art. 5, Sec. 18."

This same rule was expressed in the cases of Bland v. Orr, 90 Tex. 492, 39 S. W. 558, and Mills County v. Lampasas County, 90 Tex. 603, 40 S. W. 403.

The constitutional grant of power to the Commissioners' Court is found in Article 5, Section 18, and Article 8, Section 18, of the Constitution of Texas; and the statutory grant of power is found in Title 14 (articles 2339 to 2372c inclusive) and Articles 7206, 7211, and 7212, of the Revised Civil Statutes of Texas; but no authority for the Commissioners' court to remit taxes or to release accrued tax claims is stated in the provisions of the Constitution and statutes.

We have been unable to find any constitutional or statutory authority for any other official, state or county, to remit taxes or release accrued tax claims in this kind of a situation.

It might be suggested that the Board of Trustees or some other official of the School District could remit the school taxes, but we do not find any authority for this to be done. As far as

we can ascertain there is no Texas appellate court case direct-
ly on the question, but the language in the case of Oliver v.
Carsner, 39 Tex. 396, indicates that it can not be done. In
that case it is said:

> "The Legislature vested in the school directors
> a discretionary power to levy such tax as in their
> judgment the public necessities required. This dis-
> cretion when once exercised in fixing the amount of
> tax to be levied for any one year was exhausted, and
> the second board of directors could not revise and
> set aside the discretionary action of the former
> board."

We believe that both of these questions, that is the
releasing of county taxes and the releasing of school taxes, is
controlled by the general rule as stated in 3 Cooley on Taxa-
tion, 4th Ed. 2493, as follows:

> "Generally tax officers, or boards of county
> commissioners, or the like, have no power to com-
> promise a tax, or to release it wholly or in part,
> unless specially authorized by statute. So, where
> an assessment has become final, assessing officers
> have no authority to agree that if the taxpayer pay
> the current taxes they would forego collecting the
> taxes for preceding years."

This leaves the question of whether or not the Legisla-
ture can remit any of these taxes. We think this is controlled
by Article 3, Section 55 of the Constitution, which says:

> "The Legislature shall have no power to release
> or extinguish, or to authorize the releasing or ex-
> tinguishing, in whole or in part, the indebtedness,
> liability or obligation of any corporation or indi-
> vidual, to this State or to any county or defined sub-
> division thereof, or other municipal corporation
> therein, except delinquent taxes which have been due
> for a period of at least ten years."

Counties are specifically mentioned in this article,
and school districts are certainly included in the phrase

"defined subdivision thereof". We believe that this section means that the Legislature can only remit taxes in cases of this kind after such taxes have been due for at least ten years. They have not been due that long in this case.

Our answer to your second question is that the Commissioners' Court cannot legally remit the county taxes in this case.

Our answer to your third question is that there is not any legal method by which these school district taxes can be remitted.

We will now go into your fourth question.

Article 7150a, which went into effect in 1927, provides as follows:

"Any county in this State owning any land mentioned and referred to in Section 6a of Article VII of the Constitution of Texas adopted by the people as an amendment to the Constitution under S. J. R. No. 10 of the Regular Session of the 39th Legislature, is hereby authorized to pay taxes duly and lawfully levied on the same out of the County's revenue derived from such land. In the event any County has no such revenue, such taxes shall be paid out of the general fund of the County, and if any County has sufficient of such revenue to pay only a portion of such taxes the remainder shall be paid out of the general fund of the county. (Acts 1927, 40th Leg. 1st C. S. p. 20, Ch. 10, sec. 1)."

This article was intended to cover the kind of situation you have in this case. In the facts you have stated you say that since October 1, 1935, Tom Green County has received about $24,000 as interest money and lease money from all of its school lands, only a small portion of this being from this particular land. We believe that only the revenue derived from the particular land can be used to pay the County and School District taxes due on this land, and this belief is because this statute says the Commissioners' Court shall pay the taxes "out of the County's revenue derived from such land." "Such land" means the particular land from which the revenue is derived.

We also believe that only revenue derived from this particular land after the State owned the land can be used to pay these taxes and this belief is because the statute says "any county . . . owning any land mentioned and referred to in

Section 6a of Article VII . . . is hereby authorized to pay taxes . . . levied on the same . . .". The land must be actually owned by the State in order for the revenue from it to be so used, and revenue from the land in the form of interest on vendor's lien notes derived before the county regained title to the land could not be used to pay these taxes. You say that "during the latter part of 1937 and the early portion of 1938 this county foreclosed its vendor's lien", and we assume it obtained title at that time.

Our answer to your fourth question is that the county can go into the Available School Fund and take out a sum equal to the total revenue derived from this particular land after the state regained title to it in 1937 or 1938, but not take out any more for this purpose, and it can use this sum to pay the County and School District taxes due for the years 1932 through 1938.

We will now go into your fifth question. In answering this question, we are assuming that the money available under our answer to your fourth question is not sufficient to pay the taxes due. We believe that Article 7150a, quoted above, answers this question. It specifically says that "if any county has sufficient of such revenue to pay only a portion of such taxes the remainder shall be paid out of the general fund of the County."

Our answer to your fifth question is that the County, after using the money available as set out in our answer to your fourth question, can pay the balance due on these taxes out of the General Fund of the County.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By      Cecil C. Rotsch
        Assistant

CCR:BT

APPROVED:

ATTORNEY GENERAL OF TEXAS